**FISHER & PHILLIPS LLP**
DAVID B. DORNAK, ESQ.
Nevada Bar No. 6274
ALLISON L. KHEEL, ESQ.
Nevada Bar No. 12986
300 S. Fourth Street
Suite 1500
Las Vegas, NV  89101
Telephone: (702) 252-3131
ddornak@fisherphillips.com
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| 3535 LV NEWCO, LLC D/B/A THE LINQ RESORT AND CASINO, | Case No. |
| Plaintiff, | **PETITION TO VACATE ARBITRATION AWARD** |
| v. | |
| INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES, MOVING PICTURE TECHNICIANS, ARTISTS, AND ALLIED CRAFTS OF THE UNITED STATES, ITS TERRITORIES AND CANADA, LOCAL 720, LAS VEGAS, NEVADA, | |
| Defendant. | |

Plaintiff 3535 LV Newco, LLC d/b/a The LINQ Resort and Casino (the "LINQ" or "Employer") for its Petition to Vacate Arbitration Award (the "Petition" or "Complaint") against International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists, and Allied Crafts of the United States, its Territories and Canada, Local 720, Las Vegas, Nevada (the "Union") hereby states the following:

## **INTRODUCTION**

1. This is an action brought by the LINQ pursuant to Title 29 of the United States Code, § 185(c), Section 301 of the Labor Management Relations Act ("LMRA")

to vacate an arbitrator's award. The LINQ will file a separate motion for summary judgment supporting its Petition after the Court enters a scheduling order pursuant to Local Rule 16-1(c) establishing a briefing scheduling, which has been the standard practice in the United States District Court for the District of Nevada ("District of Nevada") involving judicial review of an arbitration award.

## JURISDICTION

2. The Court has jurisdiction over this matter pursuant to 29 U.S.C. § 185 and 28 U.S.C. § 1331.

3. The Petition is timely filed within the applicable statute of limitations period.

## VENUE

4. Venue is proper in the District of Nevada pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 185(a) and (c) because the claim arose in this judicial district. The parties entered into the CBA in Clark County, Nevada, and the arbitration hearing resulting in the arbitration award was held in Clark County, Nevada.

## PARTIES

5. The LINQ is a limited liability company organized under the laws of the State of Delaware, but maintains a place of business in Las Vegas, Nevada located at 3535 Las Vegas Boulevard South, Las Vegas, Nevada 89109.

6. At all times material hereto, the LINQ has been engaged in the hotel and casino business in Las Vegas, Nevada, an industry affecting commerce within the meaning of Section 2 of the National Labor Relations Act (the "NLRA"), 29 U.S.C. § 152.

7. The Union is an unincorporated association doing business in Nevada as a labor union representing employees in an industry affecting commerce as defined by Section 2 of the NLRA, 29 U.S.C. § 152 and Section 301 of the LMRA, 29 U.S.C. § 185. The Union's principal place of business is 3000 S. Valley View, Las Vegas, Nevada 89122.

FP 47951629.3

# FACTUAL BACKGROUND

## The Collective Bargaining Agreement

8. The LINQ and the Union are parties to a collective bargaining agreement ("CBA") that remained in full force and effect from June 1, 2017, to and including May 31, 2022. (A true and accurate copy of the CBA is attached hereto as **Exhibit 1**). The LINQ and the Union have also entered into a successor agreement that became effective on June 1, 2022, and terminates on May 31, 2027 (the "Successor CBA").

9. Pursuant to Article 2 of the CBA, the LINQ recognized the Union as the exclusive collective-bargaining representative for all Lead Stage Technicians, Full Time Stage Technicians, and On-Call Stage Technicians employed by the LINQ at its showroom. All other personnel employed by the LINQ are excluded from the CBA.

10. The functions performed by Stage Technicians are Stage Carpentry (including the Fly-person and Cue Callers), Stage Electrical (including Projectionist), Stage Properties, and Stage Sound.

11. The wage rates that Stage Technicians receive are addressed in Article 5 of the CBA. In April 2021, the LINQ paid Stage Technicians $32.10 per hour. The wage rate increased to $33.62 per hour on June 1, 2021, for the last year of the CBA. The Union and the LINQ further agreed to continue increasing wage rates for each year covered in the Successor CBA.

12. Pursuant to Article 8 of the CBA, employees covered by the CBA have the option of participating in the "Culinary (HEREIU) Welfare Fund" (the "Culinary Health Trust") or the "IATSE National Health and Welfare Fund." The LINQ will make health and welfare contributions on behalf of its employees covered by the CBA to one of those Funds based upon the specific election of the employee.

13. Both the Culinary Health Trust and the IATSE National Health and Welfare Fund are "Taft-Hartley Trusts," which are governed by the Taft-Hartley Act, codified at 29 U.S.C. § 186.

14. Due to the Culinary Health Trust and the IATSE National Health and Welfare Fund being Taft-Hartley Trusts, the LINQ and the Union must enter into a written agreement detailing the basis of any payments to the Taft-Hartley Trusts. That is because the Taft-Hartley Act does not permit an employer to make trust-fund contributions unless the agreement to do so is specified in writing.

15. The CBA is the written agreement in which the LINQ agreed to make contributions to the Culinary Health Trust or to the IATSE National Health and Welfare Fund.

16. The specific basis and obligations of the LINQ to make contributions to either the Culinary Health Trust or the IATSE National Health and Welfare Fund are contained in Article 8 of the CBA.

17. In Article 8 of the CBA, the LINQ agreed to make health and welfare contributions only for *"all hours worked or paid to any employee covered by [the CBA]."*

18. Effective June 1, 2017, the specific contribution rate to the Culinary Health Trust was $4.39. Effective June 1, 2019, the LINQ agreed to "pay any Culinary increase required for coverage" of employees covered by the CBA. In April 2021, the rate increased to $5.18. For the final year of the CBA, the contribution rate increased to $5.63 on June 1, 2021. The rate further increased in the Successor CBA.

19. Pursuant to Section 8.05 of the CBA, the LINQ agreed to pay the same contribution rates paid to the Culinary Health Trust to the IATSE National Health and Welfare Fund for employees covered by the CBA who elected to participate in the IATSE National Health and Welfare Fund.

20. The contribution rates identified in Section 8.02 of the CBA are the bargained-for maximum amounts that the LINQ is required to contribute to either the Culinary Health Trust or the IATSE National Health and Welfare Fund for all hours worked or paid to employees covered by the CBA.

FP 47951629.3

21. In addition to paying health and welfare contributions, the LINQ is required to make pension contributions on behalf of employees covered by the CBA to the IATSE National Annuity Fund pursuant to Article 9 of the CBA. The contribution amount was originally six percent (6%) "of gross wages earned by all employees covered" by the CBA and increased to seven percent (7%) on June 1, 2021.

22. Article 12 of the CBA, the Employer's Rights clause, confirms that the LINQ has the right to manage its business and to prescribe the duties of employees, to assign employees work as needed, to direct the working force, and to determine the number of employees to be employed. Section 12.01 of the CBA specifically provides:

> 12.01. The right to manage the business including all matters not covered by this Agreement, as well as the right to hire and fire employees, to determine the suitability and competence of all applicants and employees, to prescribe the duties of employees, to assign them to work as needed, to direct the working force, to determine the number of employees to be employed, to determine when a lack of work exists and to relieve employees from duty because of a lack of work and the right to determine the means, methods and schedules of installations, operations and maintenance are reserved to the Employer, except as such rights may be contrary to the terms and conditions of this Agreement.

23. Article 10 of the CBA sets forth the process the Union must follow if it believes the LINQ has violated or is violating any provision of the CBA.

24. Grievances that are not resolved during the grievance process may be referred to arbitration in accordance with Section 10.02 of the CBA. Arbitrators are limited to the interpretation and application of the parties' CBA.

25. Pursuant to Section 10.02(d) of the CBA, the Union is required in any grievance to identify the Sections of the CBA allegedly violated by the LINQ and the specific relief sought.

26. The LINQ and the Union specifically agreed in Section 10.02 of the CBA that arbitrators have **no** authority, jurisdiction or power to alter, amend, change or modify, add to or subtract from any of the provisions of the CBA.

27. Arbitrators exceed their limited contractual authority if they engage in the prohibited conduct specifically identified in Section 10.02 of the CBA, which is legal grounds to vacate any award issued by such arbitrators.

28. The CBA does not authorize interest arbitrations. Arbitrators, therefore, have no authority, jurisdiction or power to establish or create contract rights between the LINQ and the Union.

29. The CBA does not authorize arbitrators to award liquidated or punitive damages.

30. Article 13 of the CBA allows the LINQ to reduce the size of bargaining unit crews working any show. Section 13.04 of the CBA states:

> 13.04. Reduction in Size of Crews. …
>
> (b) The Employer may reduce the size of any crew at any time, provided that such reduction is predicated upon the removal from the show, or substantial modification of equipment, scenery, props or cues that regular employees were required to operate, handle or perform, notwithstanding any other provision of this Agreement.

31. Article 16 in the CBA contains the "work preservation" provisions of the agreement. It states:

> 16.01. It is recognized that the Employer and the Union have a common interest in protecting work opportunities for all employees covered by this Agreement. Therefore, no work currently or in the past performed by employees covered by this Agreement while employed by the Employer shall be performed under any sublease, contract, or other agreement unless the terms of any lease, contract or other agreement specifically state that (a) all such work shall be performed only by members of the bargaining unit covered by this Agreement, and (b) the Employer shall, at all times, hold and exercise full control of the terms and conditions of employment of all such employees pursuant to the terms of this Agreement. Any independent company brought into the theater to film press and/or advertising footage, or archival footage of the Play shall be eliminated from the provisions of this paragraph.

32. The "scope of work" provisions are contained in Article 18 of the CBA. That Article provides:

> 18.01. In recognition of the fact that work assignment practices vary from one establishment to another, it is understood and agreed that employees represented by the Union shall retain jurisdiction over such work as they have regularly been assigned to perform in the past by the Employer. In those instances where the Employer may not have had occasion to perform certain work, the question of whether such work is to be performed by stagehands shall be determined on the basis of established practice among a majority of other hotels with whom the Union is, at that time, signatory to a collective bargaining agreement.

### The Grievance

33. On April 15, 2021, the Union filed a grievance alleging that the LINQ was allowing non-bargaining unit personnel to perform bargaining unit work at the Mat Franco Showroom (the "Show"). According to the Union, such conduct displaced bargaining unit employees and violated Sections 1.01, 2.02, 5.01, 8.02, 9.02 and 16.01 of the CBA. (A true and accurate copy of the Union's grievance is attached hereto as **Exhibit 2**).

34. As its sole remedy in the grievance, the Union requested that the LINQ employ the displaced bargaining unit employees and to pay all back wages and benefits to the displaced bargaining unit employees.

35. On August 31, 2021, the Union moved the grievance to arbitration pursuant to the parties' CBA. The Union did not modify its requested remedy when it requested that the matter proceed to arbitration.

36. An arbitration was heard by Arbitrator Michael D. Durick (the "Arbitrator") on January 27, 2023, and the hearing was conducted pursuant to specific procedures in the CBA.

37. During the hearing, the Union renewed its request for a "make whole" remedy requiring the LINQ to employ the displaced bargaining unit employees and to pay all back wages and benefits to the displaced bargaining unit employees.

### The Opinion And Award

38. After receiving post-hearing briefs from the parties, the Arbitrator issued his Opinion and Award ("Award") on May 15, 2023. (A true and accurate copy

of the Award is attached hereto as **Exhibit 3**). The LINQ first received noticed of the Award on May 19, 2023.

39. The Award contained a limited synopsis of the facts, skipping over important details and testimony. Most of the Award was simply a recitation without application of the CBA provisions that the Arbitrator believed were somehow relevant to the pending issue (approximately 10 of the Award's 15 pages, including the cover page). Approximately 5 of the 10 pages that addressed the CBA provisions were also dedicated to Article 4 – Employment Practices, which the Union did not claim the LINQ violated in its grievance.

40. In the "Background" section in the Award, the Arbitrator recognized that the Union's requested remedy was to only require the LINQ to employ displaced bargaining unit employees and to pay all back wages and benefits to the displaced bargaining unit employees.

41. In his one-page "Discussion" section in the Award, the Arbitrator agreed that a bargaining unit employee could not perform the job requirements in dispute. He specifically found:

> The Company made a valid argument that the "Magi Camera Operator" is far more extensively trained in the "tricks" of the show and has to develop skills necessary to assist Mat Franco in carrying out the illusions, and in so doing**,** has to interact spontaneously with Mat Franco ***in a manner far beyond the capabilities of a stagehand just showing up for employment after being dispatched by the Union possessing only the skills anticipated by the Company under the CBA and its historical experience with such a workforce***.

42. In his one-page "Discussion" section in the Award, the Arbitrator also stated that the Union was not claiming that bargaining unit employees possessed the required skill and ability to perform the requirement of the position in dispute.

43. Despite the Arbitrator's findings in Paragraphs 41 and 42 above, the Arbitrator sustained the grievance without identifying any Articles of the CBA allegedly violated by the LINQ.

44. According to the Arbitrator, the LINQ violated an unidentified Article of the CBA by "unilaterally making changes to the [S]how which infringed on the rights of the bargaining unit employees and caused covered work to be performed by non-bargaining unit personnel." In short, the Arbitrator found that the LINQ failed to engage in bargaining when it decided to modify the Show, despite the Union's not alleging any failure to bargain claim in its grievance.

45. Due to the grievance not alleging that the LINQ failed to bargain changes to the Show, the Arbitrator had no jurisdiction to decide that issue. It was not before him, which is why the Arbitrator noted in the Award that no evidence of that issue was presented during the hearing.

46. The Arbitrator had no jurisdiction to decide whether the LINQ violated the NLRA by unilaterally making changes to the Show or by refusing or failing to bargain with the Union over employees' terms and conditions of employment.

47. Due to the Arbitrator agreeing that bargaining unit employees cannot perform the job duties of the position in dispute, the Arbitrator pointed out that it was impossible to grant the Union's requested remedy of requiring the LINQ to employ a bargaining unit employee.

48. Based upon his deduction that it was impossible to grant the specific remedy requested by the Union in its grievance, the Arbitrator rejected the Union's specific remedy on the basis that "it is not possible nor fair to either party to fashion a remedy which either returns all of the covered work to the Union nor divides the function of the Magi Camera Operator in some equitable way while appreciating the total scope of the work performed and its importance to the success of the performances."

49. Relying upon equitable considerations, the Arbitrator created a two-part remedy that was beyond his jurisdiction in the CBA and that violated the Taft-Hartley Act. The remedy was also outside the scope of the remedy requested by the Union in its grievance.

FP 47951629.3

50. In paragraph 1 of the remedy, the Arbitrator awarded a former bargaining unit employee who testified during the arbitration, but who was not specifically identified in the grievance, "liquidated damages" to penalize the LINQ for what the Arbitrator believed was the LINQ's failure to bargain over the changes in the Show. The Arbitrator awarded the former bargaining unit employee lost wages only. The LINQ was not required to make any fringe benefits contribution to the former bargaining unit employee.

51. In paragraph 2 of the remedy, the Arbitrator required the LINQ to make contributions to the IATSE National Health and Welfare Fund in perpetuity. The contributions would not be on behalf of any employee covered by the CBA or any other individual. Instead, the Arbitrator required the LINQ to send money to the IATSE National Health and Welfare Fund on behalf of nobody.

52. Due to the payments not being made on behalf of any employees for actual hours worked or paid as required by the CBA, no employees would receive coverage in exchange for the contributions.

53. In paragraph 2 of remedy, the Arbitrator required the LINQ to make contributions in an amount of money equivalent to the "total hourly compensation package" of Stage Technicians. Although the Arbitrator did not define what he meant by "total hourly compensation package," the Union has taken the position that such amount includes all wages and benefits. Consequently, the Union maintains that the LINQ would be required to remit contributions to the IATSE National Health and Welfare Fund at a rate of at least $41.60 per hour despite the CBA only requiring the LINQ to remit contributions at the rate of $5.63 per hour worked or paid for the final year of the CBA. Due to the wage and benefits increasing in the Successor CBA, the amount that the Union believes the LINQ must remit to the IATSE National Health and Welfare Fund on behalf of nobody will also increase each contract year.

54. There is no written agreement, as required by the Taft-Hartley Act, signed by the LINQ creating any obligation for the LINQ to pay contributions to the

IATSE National Health and Welfare Fund at a rate that includes all wages and benefits (including the amount paid to the IATSE National Annuity Fund).

55. There is no written agreement, as required by the Taft-Hartley Act, signed by the LINQ creating any obligation for the LINQ to make payments to the IATSE National Health and Welfare Fund on behalf of nobody.

56. The Arbitrator in his Award disregarded provisions in Article 11 (Employer's Rights and Responsibilities) that grant broad powers to the LINQ to manage its business and the direction of employees in all respects.  The Arbitrator further disregarded Article 13, which allowed the LINQ to reduce the size of its crew at any time when it modified the work performed by bargaining unit employees.

57. The Arbitrator's Award impermissibly decided an issue not before him and rewrote the LINQ's clear written obligations in the CBA to make health and welfare contributions at a specific rate and for only hours worked or paid to employees covered by the CBA.

### FIRST CAUSE OF ACTION

**(An Order Vacating The Arbitration Award
Because The Award Violates Public Policy)**

58. The LINQ repeats and realleges each and every allegation set forth in Paragraphs 1 to 57 as if fully rewritten herein.

59. Vacatur of an arbitration award is justified when it is contrary to public policy.

60. The question of whether an arbitration award violates public policy is ultimately a decision for resolution by the courts.

61. Public policy can be manifested by statues, regulations, and case law.

62. Pursuant to the Taft-Hartley Act, it is unlawful for any employer to pay money or anything of value to a union.  One exception is that an employer like the LINQ can make contribution payments to a Taft-Hartley Trust for the benefit of its

employees provided, among other things, the detailed basis on which such payments are to be made is specified in a written agreement.

63. There is an explicit, dominant and well-defined public policy prohibiting the LINQ from making contributions to the IATSE National Health and Welfare Fund without a written agreement containing the details of how contributions are to be made to the Fund.  It is illegal.

64. The details in any written agreement to pay contributions must include the amount and circumstances when such contributions are to be paid.

65. The LINQ agreed in writing to make contributions to the IATSE National Health and Welfare Fund in the CBA.  The detailed basis in which the LINQ is required to pay contributions are contained in Article 8 of the CBA.

66. Pursuant to Section 8.02 of the CBA, the LINQ is required to make contributions only "for all hours worked or paid to any employee covered by [the CBA]."

67. Section 8.02 of the CBA contains the specific and maximum amount that the LINQ is required to contribute to the IATSE National Health and Welfare Fund on behalf of employees covered by the CBA for hours worked or paid.

68. The LINQ has never entered into a written agreement to send money to the IATSE National Health and Welfare Fund on behalf of nobody.

69. The Award violates public policy by requiring the LINQ to pay money in perpetuity to the IATSE National Health and Welfare Fund on behalf of nobody.

70. The LINQ has never entered into a written agreement to remit contributions to the IATSE National Health and Welfare Fund for work not being performed or paid.

71. The Award violates public policy by requiring the LINQ to pay money in perpetuity to the IATSE National Health and Welfare Fund that is not associated with hours work or paid to any employee covered by the CBA.

72.	The Award violates public policy by requiring the LINQ to pay money in perpetuity to the IATSE National Health and Welfare Fund because there is no basis in the CBA for contributions for non-bargaining unit work.

73.	The LINQ has never entered into a written agreement to remit contributions at a rate higher that the amount specified in Section 8.02 of the CBA.

74.	The Award violates public policy by requiring the LINQ to pay money in perpetuity to the IATSE National Health and Welfare Fund that is greater than the amount specifically identified in Section 8.02 of the CBA.

75.	The Award violates public policy by giving the IATSE National Health and Welfare Fund a windfall due to no employee receiving coverage in exchange for the contributions.

## SECOND CAUSE OF ACTION

### (An Order Vacating The Arbitration Award Because The Arbitrator Exceeded His Authority And Jurisdiction)

76.	The LINQ repeats and realleges each and every allegation set forth in Paragraphs 1 to 75 as if fully rewritten herein.

77.	Vacatur of an arbitration award is justified when an arbitrator exceeds his authority and jurisdiction.

78.	Pursuant to Section 10.02(d) of the CBA, the Arbitrator had no authority, jurisdiction or power to alter, amend, change or modify, add to or subtract from any provisions of the CBA.

79.	The Arbitrator exceeded his authority and jurisdiction when he altered, amended, changed and/or modified the LINQ's obligations to pay contributions to the IATSE National Health and Welfare Fund.

80.	The Arbitrator exceeded his authority and jurisdiction when he altered, amended, changed and/or modified the contribution procedures in Article 8 of the CBA.

81. The Arbitrator exceeded his authority and jurisdiction when he altered, amended, changed and/or modified the language in Section 8.02 to require the LINQ to pay contributions on behalf of nobody instead of employees covered by the CBA.

82. The Arbitrator exceeded his authority and jurisdiction when he altered, amended, changed and/or modified the language in Section 8.02 to require the LINQ to pay contributions not associated with hours worked or paid to employees covered by the CBA.

83. The Arbitrator exceeded his authority and jurisdiction when he altered, amended, changed and/or modified the language in Section 8.02 to require LINQ to pay contributions that are not for health care costs of employees covered by the Agreement.

84. The Arbitrator exceeded his authority and jurisdiction by issuing an opinion relying upon concepts associated with "interest" arbitration instead of "rights" arbitration.

85. The Arbitrator exceeded his authority and jurisdiction by awarding liquidated damages not authorized by the CBA and punitive in nature.

86. The Arbitrator exceeded his authority and jurisdiction by awarding a remedy not requested by the Union in its grievance.

87. The Arbitrator exceeded his authority and jurisdiction when he exceeded the scope of the issue and/or grievance before him.

88. The Arbitrator exceeded his authority and jurisdiction when he expanded the scope of the issue and/or grievance before him by sustaining the grievance based upon an alleged failure to bargain changes to the Show instead of an actual Article in the CBA.

### THIRD CAUSE OF ACTION

**(An Order Vacating The Arbitration Award Because The Award Did Not Draw Its Essence From The CBA Is Based On The Arbitrator's Own Sense Of Industrial Justice Rather Than The Terms Of The CBA)**

89. The LINQ repeats and realleges each and every allegation set forth in Paragraphs 1 to 88 as if fully rewritten herein.

14

FP 47951629.3

90. Vacatur of an arbitration award is justified when an award does not draft its essence from the CBA and when an arbitrator is dispensing his own brand of industrial justice.

91. By applying equitable concepts and considerations to modify clear and unambiguous contract language, the Award does not draw its essence from the CBA and the Arbitrator dispensed his own brand of industrial justice.

92. By issuing a remedy based upon what he thought was "fair" instead of what is required or allowed, the Award does not draw its essence from the CBA and the Arbitrator dispensed his own brand of industrial justice.

93. By modifying and adding new contribution requirements in Article 8 of the CBA, the Award does not draw its essence from the CBA and the Arbitrator dispensed his own brand of industrial justice.

94. By requiring the LINQ to pay contributions on behalf of nobody instead of employees covered by the CBA, the Award does not draw its essence from the CBA and the Arbitrator dispensed his own brand of industrial justice.

95. By requiring the LINQ to pay contributions not associated with hours worked or paid to employees covered by the CBA, the Award does not draw its essence from the CBA and the Arbitrator dispensed his own brand of industrial justice.

96. By requiring the LINQ to pay contributions that are not for health care costs of employees covered by the Agreement, the Award does not draw its essence from the CBA and the Arbitrator dispensed his own brand of industrial justice.

97. By awarding liquidated damages, the Award does not draw its essence from the CBA and the Arbitrator dispensed his own brand of industrial justice.

98. By awarding liquidated damages not authorized by the CBA to penalize the LINQ for the Arbitrator's belief that the LINQ did not bargain changes to the Show, the Award does not draw its essence from the CBA and the Arbitrator dispensed his own brand of industrial justice.

FP 47951629.3

99. By requiring the LINQ to remit contributions based upon an undefined "total hourly compensation package" instead of the amount specifically identified in Section 8.02 of the CBA, the Award does not draw its essence from the CBA and the Arbitrator dispensed his own brand of industrial justice.

100. Due to the Arbitrator ignoring the LINQ's management rights in Article 12 pertaining to bargaining unit employees, the Award does not draw its essence from the CBA and the Arbitrator dispensed his own brand of industrial justice.

101. By ignoring the plain language in Article 13 allowing the LINQ to reduce the size of any crew due to changes in the Show, the Award does not draw its essence from the CBA and the Arbitrator dispensed his own brand of industrial justice.

102. By awarding a remedy not specially requested in the Union's grievance, the Award does not draw its essence from the CBA and the Arbitrator dispensed his own brand of industrial justice.

103. By basing his decision on his belief that the LINQ failed to negotiate changes to the Show—an issue not raised in the Union's grievance or before the Arbitrator—the Award does not draw its essence from the CBA and the Arbitrator dispensed his own brand of industrial justice.

104. By failing to consider the provisions of Article 18 and the fact that Stagehands do not perform similar work at other hotels where the Union is signatory to a collective bargaining agreement, the Award does not draw its essence from the CBA and the Arbitrator dispensed his own brand of industrial justice.

**FOURTH CAUSE OF ACTION**

**(An Order Vacating The Arbitration Award Because The Arbitrator Manifestly Disregarded The Law)**

105. The LINQ repeats and realleges each and every allegation set forth in Paragraphs 1 to 104 as if fully rewritten herein.

106. Vacatur of an arbitration award is justified when an arbitrator manifestly disregard the law.

107. Based upon the Arbitrator's attempt to rewrite the LINQ's obligation to make health and welfare payments, the Award shows that the Arbitrator recognized the applicability of the Taft-Hartley Act to contributions that the LINQ is required to remit under Article 8 of the CBA.

108. Despite recognizing the applicability of the Taft-Hartley Act, the Arbitrator ignore it by attempting to create "liquidated damages" to bypass the provisions of the Taft-Hartley Act requiring the LINQ to enter into a written agreement detailing the basis of any payments to the Taft-Hartley Trusts.

109. Despite recognizing the applicability of the Taft-Hartley Act, the Arbitrator ignored it by requiring the LINQ to make trust-fund contributions without an agreement to do so specified in writing.

110. Due to there being no writing (i.e., the CBA) that supports the contributions ordered by the Arbitrator, the Award violates the Taft-Hartley Act.

## **PRAYER FOR RELIEF**

WHEREFORE, the LINQ requests judgment and relief from the Court as follows:

1. That the Award of the Arbitrator be vacated in its entirety;

2. That the LINQ be awarded any other relief as may be just, equitable and proper.

Dated this 16th day of August, 2023.

FISHER & PHILLIPS LLP

 /s/ David B. Dornak, Esq.
DAVID B. DORNAK, ESQ.
ALLISON L. KHEEL, ESQ.
300 S. Fourth Street, Suite 1500
Las Vegas, Nevada 89101
*Attorneys for Plaintiff*

FP 47951629.3